

# NUMBER 13-21-00008-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF A.T.M., G.B., AND P.F.L., CHILDREN

On appeal from the 377th District Court
of Victoria County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Silva
Memorandum Opinion by Chief Justice Contreras**

This is an appeal of an order terminating parental rights. The minor children at issue are A.T.M., G.B., and P.F.L.[1] As of the time the trial concluded, the children were twelve, eight, and two years old, respectively.

G.B. II, the father of G.B., argues: (1) the trial court erred by failing to issue findings of fact and conclusions of law; (2) the trial court erred by conducting the first day of trial

---

[1] We refer to the children and their family members by their initials in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

without G.B. II physically present in the courtroom; (3) the evidence was factually insufficient to support predicate grounds for termination under Texas Family Code § 161.001(b)(1); (4) the evidence was factually insufficient to support a finding that termination was in the best interests of the children; and (5) the trial court erred in terminating G.B. II's parental rights rather than making him possessory conservator.

R.M., the mother of all three children, argues: (1) termination under part (O) of family code § 161.001(b)(1) was improper because the children were not removed pursuant to family code chapter 262; (2) termination under part (O) was improper because R.M. made a "good faith effort" to comply with the court's order; and (3) "termination under any grounds would be improper" due to "the conduct of the trial court during the termination hearing."

We affirm as modified.

## I.  BACKGROUND

Appellee, the Texas Department of Family and Protective Services (the Department), petitioned to terminate appellants' parental rights, and a bench trial was held on September 22 and October 12, 2020.[2]

### A.  Department Witnesses

At trial, Department investigator Holly Hamilton testified that she initiated an investigation on March 26, 2019, based on reports that R.M. was found under the influence of methamphetamine, that R.M. was facing truancy charges because the children had missed almost thirty days of school, and that R.M.'s home was in poor

---

[2] The Department also sought termination of the parental rights of P.F.L.'s father, D.L. He later filed an affidavit voluntarily relinquishing his rights. D.L. is not a party to this appeal.

A.T.M.'s father is deceased.

condition. Hamilton interviewed G.B., who reported that his father G.B. II was staying in the house.[3] G.B. also told Hamilton that a man named "Ricky" was living in the home and that R.M. would discipline him by spanking him on the arm with a belt; R.M. claimed G.B. was lying. Hamilton said that, based on her investigation, R.M. was "validated for neglectful supervision and for physical neglect" of all three children.

Kelsey Koenig testified she was the Department caseworker initially assigned to the case. She said there were concerns that R.M. had untreated mental health issues, including post-traumatic stress disorder, anxiety, and depression; there were also concerns of domestic violence "with both fathers." When Koenig visited R.M.'s residence in March of 2019, there were "holes in the floor," "some broken windows," and "not a large amount of food." On March 25, 2019, Koenig contacted law enforcement because she could hear the children inside the home but no one answered the door. After about thirty minutes, R.M. answered the door; however, she appeared intoxicated and tested positive for methamphetamine on an "instant oral drug screen."[4] Koenig said P.F.L. was dirty and wearing dirty clothes, and A.T.M. had "ringworm on his face." At that point, a safety plan was instituted and R.M. agreed to be supervised when caring for the children. However, because there were no appropriate supervisors available, the Department sought removal of the children on March 27. At the trial court's urging, Koenig produced photos from her cell phone depicting the children's condition at the time of removal; the photos were entered into evidence. Koenig said G.B. II was not at the residence at the time of the

___

[3] After the removal, G.B. II told Hamilton that he was not staying with R.M. at her residence; however, he did not tell Hamilton where he was living.

[4] Koenig stated R.M. denied using methamphetamine but instead suggested that "one of the fathers to the children had been at the home and put something in her drink possibly."

removal, but he was sleeping there when she previously visited on March 14. She thus could not say whether G.B. II was aware of A.T.M.'s ringworm.

Erica Broll, another Department investigator, testified she accompanied Koenig to the residence on March 25. Broll said the home lacked running water and was "very disorganized." She said that when R.M. finally came to the door, she had "dilated pupils" and red eyes, and she was wearing dirty clothes. Additionally, there were "a lot of safety concerns for the children" inside the home, including extension cords on the floor, broken windows, holes in the floor, dirty floors, rodent droppings, and cabinets without doors. Broll said she contacted the children's pediatrician and learned that A.T.M. and G.B. were both born "extremely premature" and had been diagnosed with retinopathy of prematurity.[5] Despite this, A.T.M. had not been seen by the pediatrician since 2013 (when he was six years old) and G.B. had not been seen since 2014 (when he was one year old).

Shawna Yarbrough testified that, as the primary Department caseworker assigned to the case, she prepared family service plans for both appellants, and those plans were made orders of the court. According to Yarbrough, R.M. was dropped from an outpatient drug and alcohol treatment program due to "noncompliance." R.M. completed parenting classes and a psychiatric evaluation but did not follow through with the psychiatrist's recommendations for further treatment. R.M. lived in four different residences during the time Yarbrough was involved in the case, and R.M. was unemployed when Yarborough left the case. R.M. tested positive for methamphetamines in June 2019, but she denied

---

[5] Retinopathy of prematurity is a potentially blinding eye disorder that primarily affects premature infants. *Retinopathy of Prematurity*, Nat'l Eye Inst., https://www.nei.nih.gov/learn-about-eye-health/eye-conditions-and-diseases/retinopathy-prematurity (last visited June 23, 2021).

usage; instead, she said she had handled the drugs for a dealer she worked with. Later in June, R.M. did not show up for a urinalysis or hair follicle drug test. In August of 2019, R.M. tested positive for marijuana and methamphetamine.

Yarbrough testified she met with G.B. II and his attorney and G.B. II signed the service plan. She discussed with him the possibility of participating in services while incarcerated, but he did not complete any services during her time as caseworker. She stated that, even though G.B. II was not present during the children's removal, he was "present in the residence prior to the removal," and "the issues with the residence did not occur overnight."

The three children were placed together in a foster home. According to Yarbrough, P.F.L. was developmentally delayed at the start of the case, but she is doing well in foster care and is developmentally on target. A.T.M. is also "doing very well" with the foster family. G.B. has had "severe meltdowns" throughout the case—including screaming, kicking, and hitting his head on objects—but was doing well in school and was in counseling. At the time of removal, both A.T.M. and G.B. "were in need of excessive dental work," which they have since received while in foster care. Yarborough agreed that the three children are very bonded and depend on each other.

Karen Ortiz-Washington took over as Department caseworker in February of 2020. She stated R.M. "somewhat engaged" in services but missed "a lot" of classes and failed to attend "most" drug tests. R.M. tested negative for drugs in February 2020 but tested positive for marijuana in March. In June, R.M. tested positive for marijuana and barbiturates, and she did not appear for tests scheduled in May, August, or October. According to Ortiz-Washington, R.M. has not been able to maintain a job for more than

three months, she has not shown housing stability, and she has not made efforts to change her behavior. Further, G.B. II has not complied with his plan because he has been incarcerated.

Ortiz-Washington said A.T.M. is "doing very well" in his placement and in school, and P.F.L. is "doing great" and is "very attached" to the foster parents. G.B. has behavioral issues at home to the extent that the family is "not really able to go on outings because of the behaviors he's been displaying." However, G.B. is in counseling and the foster parents are providing for all of his needs. She said the children told her they "love the home where they're at" and "want to stay there." The children's attorney ad litem and a Court Appointed Special Advocate (CASA) representative both agreed that the children want to stay in their current placement.

**B. Counselors**

Licensed professional counselor Kim Wilgus testified that she has been counseling A.T.M. and G.B. since April 2019. According to Wilgus, G.B. reported that there were times when he would not have food when he was hungry, and he was worried about "not going to school a lot" and "not having clean clothes." Wilgus stated that A.T.M. "has done really well" and has "adjusted" to the foster placement, whereas G.B. "has a little bit more struggles" controlling his behavior, especially after visits with his mother. She said that since the counseling started, the two boys have "made great progress" and they "love home life" with their foster parents, where they have a consistent daily routine. She acknowledged that she did not visit or observe the foster home.

Wilgus said A.T.M. initially wanted to see his mother, but after a couple of months, R.M. went to jail and "at that point [A.T.M.] didn't want to know anything about her

6

anymore." According to Wilgus, A.T.M.'s father was murdered in 2019; Wilgus initiated grief counseling with the child, but after about two sessions, A.T.M. "didn't want to talk about it anymore." A.T.M. told Wilgus that R.M. would not pay attention to him during visits.

G.B. also initially wanted to see his mother, but he "didn't want to go back" to living with her because of the poor conditions. G.B. knew that his father was "gone," though he did not know why. Wilgus said G.B. "didn't have many memories" of G.B. II; instead, G.B. considered D.L., P.F.L.'s father, to be his father. Wilgus said G.B. and A.T.M. expressed to her "on several occasions" that they would like to stay with the foster family, and Wilgus opined that this was in their best interests.

Hannah Hayward testified that she provided drug and alcohol counseling to R.M. from March of 2016 until September of 2020. R.M. appeared for fourteen out of the twenty scheduled one-hour individual sessions, which were held by video conference. According to Hayward, R.M. "appeared open and honest at times, but not completely forthcoming and knowledgeable about the issues with drugs and alcohol," and she made "minimal" progress on her treatment goals.

Tammy Hogan, a counselor at the Center for Healthcare Services, testified she evaluated R.M. on April 8, 2019, and diagnosed her with "cannabis use disorder (severe), opioid use disorder (severe in sustained remission), and amphetamine use disorder (moderate)." Hogan said R.M. tested positive for methamphetamine, and she admitted to selling it, but not to using it.

## C.    Law Enforcement

Officer Jesse Garcia of the Victoria Police Department testified he approached

R.M. in a Dollar General parking lot in August 2019 because R.M. was asleep inside her car with the engine on, and he suspected she might be intoxicated. R.M. was permitted to leave after someone came to pick her up. The next day, Garcia encountered R.M. at DeTar Hospital, where R.M. was being treated for facial injuries. According to Garcia, R.M. reported that she had been assaulted by a man named "Juan" with a nickname of "Puggy." However, R.M. was not forthcoming with details about the assault.

David Reed, a Victoria Police Department detective, stated that he was notified on August 10, 2019, about a Facebook post showing R.M. with facial injuries and stating, "Only cowards put their hands on their daughter's mother." This led Reed to believe a crime had been committed. When he sought to interview R.M., she was not cooperative. Eventually, she came in to discuss the case. She explained that D.L.'s mother was the one who picked her up from Dollar General, and that D.L. assaulted her in the car on the way home. She admitted to Reed that she previously lied to Garcia about who assaulted her. Reed stated that D.L. was arrested for the assault but was later released on bond on the condition that he have no contact with R.M. or the children.

## D.    Appellants

R.M. denied ever using methamphetamine or any unprescribed drugs, though she admitted using marijuana in the past, and she admitted she tested positive for methamphetamine on March 25, 2019. She could not remember the last time she took a drug test at the request of the Department, but she said it was at least "a couple of months" ago, because she had "been working a lot." When asked why the children missed so much school, R.M. explained:

> I mean, it should have been, you know, on all the documentation that, you know, it was very cold. If they, you know, didn't get on the bus soon enough,

8

or they were sick a lot as well. That's—I mean, that's basically it. We lived too far away. If I would have walked them up there, you know, I had a one-year-old baby. It was very cold outside. I mean, there was a few times that they missed the bus. They were also sick a lot.

On the matter of domestic violence, R.M. testified she "fought ugly" with G.B. II. When asked to clarify, she stated: "Like throwing me around, things like that, pushing and shoving and things like that." Upon further questioning by the trial court, R.M. denied that G.B. II ever hit her in the face or threw her to the ground. She also denied that G.B. II kicked, punched, or slapped her. However, she conceded that G.B. II put his hands around her neck on multiple occasions, including once in the presence of the children, which upset them. She said she split up with G.B. II after that incident.

R.M. stated that the pediatrician had not seen A.T.M. or G.B. in years because she "changed doctors" for those children. She averred that A.T.M. was "also seen for the ringworm on multiple occasions." R.M. said that G.B.'s immune system "is really low" and that the children "have like severe ADHD, things like that."

R.M. was questioned about her encounters with police during the course of the case. On August 5, 2019, at the Dollar General, police informed her she did not have a license plate or driver's license. R.M. first testified that she was parked there because she was "having problems" with the car and the car "didn't want to start," but she later conceded that this was not true. Later that evening, according to R.M., D.L. hit her in the face with his fist "a few" times, breaking her nose, while the two were passengers in D.L.'s mother's car. The incident caused her to miss two weeks of work, but she did not file a police report. On questioning by the trial court, R.M. could not explain why D.L. assaulted her. She denied ever seeing D.L. use drugs. In October of 2019, R.M. was arrested outside of a Walmart for possession of ecstasy, marijuana, unprescribed valium, and a

9

drug test falsification device. She served ninety days in jail and was released on January 7, 2020. At trial, R.M. denied that she had been using drugs in October of 2019—instead, when asked to explain why she was arrested for possession of drugs, she claimed she had been selling them. She explained she had been selling drugs for "[a] couple of years," but she has since stopped. She denied ever selling drugs with G.B. II or around the children.

R.M. admitted that, at the beginning of the case, she refused to drug test for the Department on two occasions because she knew she would test positive. Later, she missed other drug tests because she was working. She said she completed parenting classes and twelve weeks of drug counseling. She also said she is taking medication that has been prescribed for her mental health issues.

According to R.M., she was last in a relationship with G.B. II in 2016. She conceded that G.B. II had stayed in her home for "[a] day or two" in 2019 to visit G.B. Later, she said G.B. II stayed at her house overnight "[s]everal times" to visit G.B. R.M. said she currently lives at G.B. II's aunt's house and works as a cashier at a restaurant.[6] Photos of G.B. II's aunt's residence were entered into evidence. R.M. also said she applied for Section 8 public housing. She admitted she has never had an active driver's license.

G.B. II testified that he was convicted of the aggravated robbery of D.L., a first-degree felony; tampering with physical evidence, a third-degree felony; and theft of a firearm, a state jail felony. At the time of trial, he had been incarcerated for a year on concurrent ten- and five-year prison terms. He stated he would be eligible for parole in

---

[6] At the second part of the trial in October of 2020, R.M. said she no longer worked at the restaurant but was working at an auto parts store.

2023. G.B. II said he last talked to his son G.B. one and a half years ago. He explained that he wrote three letters to G.B. through the Department, but he did not know if they were received, and he could not check whether they had been delivered because he was in prison. G.B. II denied ever putting his hand around R.M.'s neck or physically abusing her. He admitted that he was previously ordered to pay child support to R.M. but has not done so. He did not take parenting classes or individual counseling as ordered by the service plan; however, he said that was because no such classes were available at the correctional facilities where he was housed. G.B. II said he did enroll in vocational classes as well as a "cognitive intervention" drug treatment program at the prison.

G.B. II testified that he previously used methamphetamine about twice a month but last did so two years ago and never did so in front of the children. He said he was not living with R.M. at the time the children were removed, though he had previously visited "a couple of times." He agreed with his counsel that he "didn't contribute to any of the situations that caused the children to be taken" from R.M. The same day the children were removed, G.B. II was arrested for violating his probation, and he remained in the county jail until July 2019, when he was transferred to the Texas Department of Criminal Justice (TDCJ). He was in the prison intake unit until February of 2020. He said parenting classes were not offered at either the county jail or the TDCJ intake unit. When he was transferred to a different TDCJ unit, he enrolled in parenting classes, but they have not started yet because of the pandemic.

G.B. II said that, before he was incarcerated, he was living with his brother. He testified his brother is interested in custody and adoption of G.B.

11

**E. Trial Court's Ruling**

As to both appellants, the trial court found predicate grounds for termination under part (O) of family code § 161.001(b)(1), and it found that termination was in the best interests of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O), (2). As to G.B. II, the trial court also found predicate grounds for termination under parts (C), (N), and (Q) of § 161.001(b)(1). *See id.* § 161.001(b)(1)(C), (N), (Q).[7] The trial court ordered both appellants' parental rights terminated and designated the Department as permanent managing conservator for the children. This appeal followed.

## II. APPLICABLE LAW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v.*

---

[7] The relevant parts of the statute authorize termination if the parent:

(C) voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months; . . .

(N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than six months, and:

   (i) the department has made reasonable efforts to return the child to the parent;

   (ii) the parent has not regularly visited or maintained significant contact with the child; and

   (iii) the parent has demonstrated an inability to provide the child with a safe environment; . . .

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of [the Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . [or]

(Q) knowingly engaged in criminal conduct that has resulted in the parent's:

   (i) conviction of an offense; and

   (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition[.]

TEX. FAM. CODE ANN. § 161.001(b)(1)(C), (N), (O), (Q).

*Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi—Edinburg 2010, no pet.); *see In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112. In such cases, due process requires application of the "clear and convincing" standard of proof. *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). This intermediate standard falls between the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

The court may order termination of the parent-child relationship only if it finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code § 161.001(b)(1); and (2) termination is in the best interest of the child. *Id.* § 161.001(b)(1), (2).

### III.    G.B. II's Issues

### A.    Failure to Issue Findings and Conclusions

By his first issue, G.B. II argues the trial court erred by failing to issue findings of fact and conclusions of law pursuant to his timely request. "In any case tried in the district or county court without a jury, any party may request the court to state in writing its findings of fact and conclusions of law." TEX. R. CIV. P. 296. "The court shall file its findings

13

of fact and conclusions of law within twenty days after a timely request is filed." TEX. R. CIV. P. 297. Because the duty to file findings and conclusions is mandatory, a trial court's failure to do so upon proper request is "presumed harmful" unless "the record before [the] appellate court affirmatively shows that the complaining party has suffered no injury." *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989); *see Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex. 1996) (per curiam). Injury may be present when "the circumstances of the particular case would require an appellant to guess at the reasons for the trial court's decision." *Gen. Elec. Capital Corp. v. ICO, Inc.*, 230 S.W.3d 702, 711 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

G.B. II contends that, because the evidence adduced against him was "slim, at best," it was "imperative for the trial court to make its findings and conclusions" so that G.B. II "would not have to guess at the reason for his termination." We disagree. Regardless of the quantity or quality of evidence adduced against him, the reasons for the trial court's ruling were fully set forth in the final judgment. *See In re D.H.*, No. 2-05-179-CV, 2006 WL 133523, at *2 (Tex. App.—Fort Worth Jan. 19, 2006, no pet.) (mem. op., per curiam) ("[A]ppellant does not have to guess the reasons for the trial court's termination order because they are clearly stated in the order."). In particular, the order set forth the specific statutory grounds upon which termination of G.B. II's parental rights was based. Moreover, the record contains a full transcript of the proceedings, including the trial, and G.B. II does not argue that the lack of findings and conclusions made him unable to properly present his case in this appeal. *See* TEX. R. APP. P. 44.2(a) (providing that, in civil cases, "[n]o judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error

complained of: (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals"); *In re J.I.T.P.*, 99 S.W.3d 841, 849 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (holding that appellant was not prevented from properly presenting her case on appeal "[b]ecause there is a complete reporter's record," appellant "was able to fully brief" her evidentiary sufficiency issue, and the court was "able to fully review" that issue); *Hatteberg v. Hatteberg*, 933 S.W.2d 522, 529 (Tex. App.—Houston [1st Dist.] 1994, no writ) (noting that, when the record includes a full reporter's record, a trial court's findings of fact are not conclusive in an appellate review of evidentiary sufficiency).[8]

We conclude that the record affirmatively shows that G.B. II was not harmed by the trial court's failure to file findings of fact and conclusions of law in this case. *See Cherne Indus., Inc.*, 763 S.W.2d at 772. His first issue is overruled.

## B. Telephonic Appearance

G.B. II argues by his second issue that the trial court erred by conducting the first day of the termination trial without his physical presence in the courtroom. The record shows that, on September 11, 2020, the Department's counsel filed a "Motion for Defendant-Inmate to Appear by Phone for Trial" stating in relevant part:

> NOW COMES, the Respondent father, [G.B. II] [sic], in the above entitled and numbered cause by and through counsel, moves the Honorable Court to order his telephonic appearance for trial on the merits scheduled for Tuesday, September 22, 2020 at 10:00 a.m. concerning the termination of

---

[8] G.B. II notes that, under Texas Rule of Civil Procedure 299a, "[f]indings of fact shall not be recited in a judgment" but instead "shall be filed with the clerk of the court as a document or documents separate and apart from the judgment." TEX. R. CIV. P. 299a. He argues that this rule would be rendered "superfluous" if findings in a judgment could be considered by an appellate court in determining whether an appellant needed to "guess" as to the reasons for the trial court's ruling. Here, the trial court's judgment contained conclusions of law regarding which specific statutory grounds supported the termination order. Those conclusions of law apprised G.B. II of the reasons for the trial court's ruling and thereby allowed him to properly present his case on appeal. There are no findings of fact in the judgment; thus, Rule 299a is inapposite.

his parental rights by a governmental entity . . . .

> There is currently a public health crisis due to the Coronovirus [sic] Pandemic (COVID19). Because of this emergency, situation and in efforts to contain the pandemic, court hearings will be via teleconference. . . .

> WHEREFORE, PREMISES CONSIDERED, Respondent father [sic] prays the Court issue and order for his telephonic appearance on Tuesday, September 22, 2020 @ 10:00 a.m.

The motion contains the Department's counsel's name in the signature block and states "w/permission [Department's counsel's name]" typed in the signature line. The trial court signed an order granting the motion on September 14, 2020.

G.B. II argues on appeal that termination proceedings are "quasi-criminal" in nature, and therefore, he should have been afforded the same opportunity to be physically present at trial as a criminal defendant.[9] *See Garcia v. State*, 149 S.W.3d 135, 140 (Tex. Crim. App. 2004) ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom during his trial."). And, he contends that his telephonic appearance on the first day of the termination trial was inadequate to protect his rights. He observes that, according to the reporter's record of the September 22, 2020 part of the trial, there were at least four instances when he stated on the record that he could not hear a witness's testimony. G.B. II also argues that he was deprived of his right to effective assistance of counsel because he was not "afforded the opportunity to confer" with counsel prior to trial, as generally mandated by the family code. *See* TEX. FAM. CODE ANN. § 107.0131(a)(1)(G) (stating that an attorney ad litem

---

[9] G.B. II states in his brief that "[i]t is the practice in Victoria County for counsel for the Department to ensure that any incarcerated parent be bench warranted so that his or her right to be present at trial can be had" and "[i]f the party is in the Victoria County Jail, a phone call is placed to the jail and the party is brought over to the courtroom or is provided a room to view the proceedings via Zoom." G.B. II does not cite any authority supporting these propositions, though he notes that the Department had previously filed a "Motion for Bench Warrant" seeking to compel D.L. to appear at a May 31, 2019 status hearing.

appointed to represent an indigent parent must "meet before each court hearing with the parent, unless the court: (i) finds at that hearing that the attorney ad litem has shown good cause why the attorney ad litem's compliance is not feasible; or (ii) on a showing of good cause, authorizes the attorney ad litem to comply by conferring with the parent, as appropriate, by telephone or video conference").

The Department claims that G.B. II failed to preserve this issue for appellate review. We agree. G.B. II concedes that he did not object to his telephonic appearance before the trial court; he did not complain to the trial court that he was unable to confer with his attorney; he did not request the issuance of a bench warrant to compel his physical presence on September 22, 2020; and he did not ask the trial court for a continuance so that he could appear physically at a later date. *See* TEX. R. APP. P. 33(a) (setting forth requirements for preservation of error for appeal); *In re D.S.*, 333 S.W.3d 379, 386 (Tex. App.—Amarillo 2011, no pet.) ("[P]reservation of error concerning meaningful participation by telephone required the father to make a timely objection specifying the grounds for the objection at the earliest opportunity and obtain an adverse ruling from the trial court."). Moreover, G.B. II does not argue that his trial counsel provided ineffective assistance by failing to do these things.[10]

G.B. II emphasizes that the "Motion for Defendant-Inmate to Appear by Phone for Trial" incorrectly stated that it was being brought by G.B. II as opposed to the Department, and he suggests the court would have issued a bench warrant for his physical appearance if the motion were accurately attributed to the Department. That suggestion is not

---

[10] G.B. II is represented on appeal by the same court-appointed counsel that represented him at trial.

supported by the record. The Department's error in attributing the motion to G.B. II was negligent, at best, but there is nothing in the record showing that G.B. II ever made the trial court aware that he objected to the telephonic appearance or wanted to appear personally.

Even if G.B. II had objected to his telephonic appearance and moved for the issuance of a bench warrant, he has not shown that the trial court would have erred in denying such a motion. The Texas Supreme Court has held:

> It is well-established that litigants cannot be denied access to the courts simply because they are inmates. However, an inmate does not have an absolute right to appear in person in every court proceeding. Instead, the inmate's right of access to the courts must be weighed against the protection of our correctional system's integrity. . . . Texas courts of appeals have recognized a variety of factors that trial courts should consider when deciding whether to grant an inmate's request for a bench warrant. These factors include the cost and inconvenience of transporting the prisoner to the courtroom; the security risk the prisoner presents to the court and public; whether the prisoner's claims are substantial; whether the matter's resolution can reasonably be delayed until the prisoner's release; whether the prisoner can and will offer admissible, noncumulative testimony that cannot be effectively presented by deposition, telephone, or some other means; whether the prisoner's presence is important in judging his demeanor and credibility; whether the trial is to the court or a jury; and the prisoner's probability of success on the merits. . . . [S]ince a prisoner has no absolute right to be present in a civil action, it follows that the prisoner requesting a bench warrant must justify the need for his presence.

*In re Z.L.T.*, 124 S.W.3d 163, 165–66 (Tex. 2003) (internal citations omitted). Here, the trial court was authorized, subject only to constitutional limitations, to order G.B. II to participate remotely in the termination trial, even without his consent, in order to avoid the risk associated with the COVID-19 pandemic. *See Twenty-Second Emergency Order Regarding the COVID-19 Disaster*, § 3(c), Misc. Docket No. 20-9095 (Tex. Aug. 6, 2020). And, there is nothing in the record indicating that G.B. II's telephonic appearance on September 22, 2020, meaningfully deprived him of any constitutional right. Although there

18

were times when G.B. II could not hear the witnesses, he was able to communicate that fact to the trial court, and the trial court instructed the witnesses to repeat their testimony on each occasion. Importantly, G.B. II appeared physically at the second part of the trial, during which he gave his testimony. Under these circumstances, where G.B. II did not justify the need for his physical presence, the trial court would not have abused its discretion in denying a request for a bench warrant. *See id.* at 165 (reviewing denial of bench warrant for abuse of discretion).

G.B. II's second issue is overruled.

## C.    Factual Sufficiency

G.B. II's third and fourth issues challenge the factual sufficiency of the evidence supporting termination of his parental rights. When reviewing the factual sufficiency of the evidence supporting termination, we ask "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In conducting this review, we consider whether the disputed evidence is such that a reasonable finder of fact could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

Under the factual sufficiency standard, we defer to the trier of fact's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *see In re*

19

*H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam); *see also In re C.H.*, 89 S.W.3d at 26 ("A standard that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role.").

### 1.    Predicate Grounds

Pursuant to § 161.001(b)(1)(Q), termination of parental rights is permitted upon a showing by clear and convincing evidence that the parent "knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition." TEX. FAM. CODE ANN. § 161.001(a)(1)(Q). In his argument with respect to part (Q), G.B. II argues that the evidence was factually insufficient to support a finding that he had an "inability to make provisions for the care of [G.B.]" because: (1) his brother is interested in custody of the child and a home study was going to be conducted; and (2) G.B. was at one point living with R.M. at G.B.'s aunt's house. G.B. II cites *In re Caballero*, in which the Amarillo Court of Appeals held that "[b]ecause incarceration is inherently inconsistent with providing personal care for a child, the legislature's inclusion of the phrase 'and inability to care for the child' [in part (Q)] would be meaningless unless care encompassed arranging for care to be provided by another." 53 S.W.3d 391, 396 (Tex. App.—Amarillo 2001, pet. denied).

Under part (Q), "inability to care for the child" may not be based on a mere showing of prolonged incarceration. *In re J.G.S.*, 574 S.W.3d 101, 118 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). But when there is evidence showing the parent engaged in criminal conduct resulting in confinement for two or more years, as here, the parent then bears the burden to "produce some evidence of how the parent will provide care for the

child during the period of confinement" or "that the parent has arranged with another person for that person to provide care for the child during the period of confinement." *Id.* at 119; *see Caballero*, 53 S.W.3d at 396. A parent relying on another's provision of care to avoid termination under part (Q) "must demonstrate that the care is being provided on behalf of the parent, not out of an existing duty or inclination to care for the child." *In re J.G.S.*, 574 S.W.3d at 119; *see In re H.R.M.*, 209 S.W.3d 105, 110 (Tex. 2006) (per curiam) (holding, where evidence showed that mother continued to care for the child and maintained contact with father, that this "does not show that she agreed to care for [the child] on [father's] behalf").

During his testimony at trial, G.B. II was asked directly: (1) whether he knowingly engaged in criminal conduct in the past; (2) whether that conduct led to conviction of an offense for which he is currently imprisoned; and (3) whether "it has caused an inability to care for [G.B.] for not less than two years." G.B. II answered all three questions in the affirmative. The burden of production therefore shifted to G.B. II to show how he would be able to provide care during his period of confinement. *See In re J.G.S.*, 574 S.W.3d at 119. He failed to meet that burden. There was no evidence that any person had ever taken care of the child on G.B. II's behalf in the past,[11] nor was there any evidence that any person would be able to adequately care for the child on G.B. II's behalf in the future. In particular, though G.B. II testified his brother is interested in caring for and adopting G.B., there was no evidence that his brother was capable of doing so or agreed to do so on G.B. II's behalf during the time he is incarcerated. We conclude that, on this record,

---

[11] G.B. II does not point to any testimony in the record showing that G.B. was living in G.B. II's aunt's house, and we find none. In any event, G.B. II does not dispute that the record lacks evidence showing that the child was living there on G.B. II's behalf.

the trial court could have reasonably formed a firm belief or conviction that G.B.'s II criminal conduct and incarceration resulted in his "inability to care for [G.B.] for not less than two years from the date of filing the petition." TEX. FAM. CODE ANN. § 161.001(b)(1)(Q).

Because we have found factually sufficient evidence to support a finding under part (Q), we need not address whether the evidence was factually sufficient to support the other predicate grounds for termination under § 161.001(b)(1). *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) ("To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground."); TEX. R. APP. P. 47.1. G.B. II's third issue is overruled.

## 2. Best Interests

By his fourth issue, G.B. II argues the evidence was factually insufficient to support the trial court's finding that termination of his parental rights was in G.B.'s best interest.

There is a strong, though rebuttable, presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131; *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Factors that we consider in determining whether termination of parental rights is in a child's best interest include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the

22

existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The party seeking termination is not required to prove all nine *Holley* factors; in some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 25, 27.

As to the first *Holley* factor, G.B.'s counselor testified that the child knew G.B. II was "gone" and did not have "many memories" of him. The Department caseworker, the children's attorney ad litem, and the CASA representative each stated that all three children, including G.B., want to stay with the foster family. Consideration of this factor weighs in favor of termination.

Evidence of G.B.'s health and behavioral issues is relevant to the second factor. Broll testified G.B. was born "extremely premature" and was diagnosed with a potentially blinding eye disorder. R.M. said G.B. has a weakened immune system. Yarbrough stated that G.B. needed "excessive dental" treatment at the time of his removal, though he has since received that treatment while in foster care. Yarbrough also stated G.B. regularly has "severe meltdowns" involving kicking, screaming, and hitting his head on objects. According to Ortiz-Washington, these behaviors are serious enough that they prevent the foster family from "go[ing] on outings." The evidence reflects that the emotional and physical needs of G.B., both now and in the future, are considerably more demanding than that of a typical eight-year-old child. Consideration of this factor weighs in favor of termination.

As to the third *Holley* factor, the Department witnesses testified that R.M.'s residence was disorganized and dirty, with holes in the floor, broken windows, rodent

droppings, and other safety concerns. Broll said the residence lacked running water and Koenig stated there was not much food in the house. Wilgus said that G.B. reported being hungry and was worried about not going to school and wearing dirty clothes. The drug use of both appellants is also relevant to this factor. R.M. tested positive for methamphetamines on multiple occasions, and she admitted to selling them during the time she was the primary caregiver for the children. G.B. II admitted to using methamphetamine in the past, though he stated he had not done so in two years. Crucially, according to Hamilton, G.B. reported that his father was living in the residence around the time of the removal. Both appellants testified that G.B. II had visited the residence overnight on multiple occasions prior to the children's removal. Although G.B. II denied that he was responsible for the poor conditions of R.M.'s residence, it was not unreasonable for the trial court to have discredited that testimony. *See In re J.P.B.*, 180 S.W.3d at 573. In any event, at the very least, this evidence establishes that G.B. II was unwilling or unable to mitigate the physical and emotional dangers presented to the children by R.M.

Also relevant to the third *Holley* factor is G.B. II's history of violence and criminal conduct. He was convicted of three felonies, including the aggravated assault of P.F.L.'s father. R.M. testified G.B. II put his hands around her neck on multiple occasions, including once in front of the children, upsetting them. G.B. II denied this, but again, it was not unreasonable for the trial court to have disbelieved him. *See id.* Consideration of this factor weighs in favor of termination.

As to the fourth and eighth factors, G.B. II stated he sent three letters to G.B. during the case but did not know if they were received. Aside from the evidence discussed above

24

regarding G.B. II's criminal conduct and the poor conditions of R.M.'s residence, there is nothing else in the record which is probative as to G.B. II's parenting abilities or indicating that the parent-child relationship was improper. Consideration of these factors weighs slightly in favor of termination.

As to the fifth *Holley* factor, G.B. II did not complete any services required by the service plan. However, this was principally because he was incarcerated and did not have access to those services. Consideration of this factor weighs neither in favor of nor against termination.

Regarding the sixth and seventh factors, the Department witnesses testified that G.B. is doing well in his current foster placement. Although he still has behavior problems, they manifest themselves mostly at home and not at school, and the foster parents are able to provide for all his needs. Beyond explaining that his brother is interested in custody and adoption of G.B., G.B. II did not detail any plans for the child. Consideration of these factors weighs in favor of termination.

A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in determining best interest. *In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). A factfinder may consider the consequences of failure to terminate parental rights and may also consider that the child's best interest may be served by termination so that adoption may occur, rather than the impermanent foster-care arrangement that would result in the absence of termination. *See In re K.C.*, 219 S.W.3d at 931. With those principles in mind, we conclude that a reasonable trier of fact could have reasonably formed a firm belief or conviction that

25

termination of G.B. II's parental rights was in G.B.'s best interests. *See In re J.F.C.*, 96 S.W.3d at 266. G.B. II's fourth issue is overruled.

**D.    Trial Amendment**

By his fifth issue, G.B. II argues that the trial court erred by overruling his request, made during trial, to orally amend his pleadings to request appointment as a possessory conservator of G.B. He also argues by this issue that the trial court erred by terminating his rights instead of appointing him possessory conservator.

At the conclusion of G.B. II's trial testimony, his counsel asked him whether he was seeking to be designated a possessory conservator of G.B. Counsel for the Department objected to the question on grounds that "[t]here are no pleadings on file to allow that," and G.B II's counsel requested an oral trial amendment under Texas Rule of Civil Procedure 66. *See* TEX. R. CIV. P. 66 ("[I]f during the trial any defect, fault or omission in a pleading, either of form or substance, is called to the attention of the court, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the allowance of such amendment would prejudice him in maintaining his action or defense upon the merits."). The trial court sustained the Department's objection. Later, when G.B. II asked Ortiz-Washington about his being named possessory conservator, the Department again objected on grounds that there were no supporting pleadings. This time, the trial court did not sustain the objection but instead stated: "Well, just go ahead and ask anything you want to about possessory. It's okay with me." G.B. II's counsel then asked Ortiz-Washington whether the Department would consider recommending that G.B. be named a possessory conservator, and Ortiz-Washington

replied "No."

Arguably, this issue has not been preserved because, though the trial court initially sustained the Department's objection, it later reversed that decision and heard testimony regarding G.B. II's desire to be named possessory conservator. *See* TEX. R. APP. P. 33.1(a). Even assuming the issue has been preserved for appeal, we conclude it lacks merit. Once an appellate court determines that the evidence is sufficient to support termination of parental rights, any issues regarding that parent's conservatorship of the child are rendered moot. *See Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.— Houston [1st Dist.] 2010, pet. denied); *see also Pruitt v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *9 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.); *In re K.R.L.*, No. 14-10-00187-CV, 2010 WL 4069351, at *8 (Tex. App.—Houston [14th Dist.] Oct. 19, 2010, no pet.) (mem. op.). G.B. II's fifth issue is overruled.

## IV.   R.M.'s ISSUES

### A.   Predicate Grounds

R.M. argues by her first two issues on appeal that the trial court erred in finding grounds for termination under family code § 161.001(b)(1)(O). Under that part of the statute, termination is authorized upon a showing by clear and convincing evidence that the parent

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of [the Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . .

TEX. FAM. CODE ANN. § 161.001(b)(1)(O). However, termination under part (O) may not

be "based on the failure by the parent to comply with a specific provision of a court order" if the parent proves by a preponderance of evidence that: "(1) the parent was unable to comply with specific provisions of the court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent." *Id.* § 161.001(d).

By her first issue, R.M. argues that the children were not removed from her "under Chapter 262 for the abuse or neglect of the child . . . ." *Id.* § 161.001(b)(1)(O). The record reflects that the Department filed its petition seeking removal and termination on March 27, 2019. The petition included an affidavit by Broll stating, among other things, that the Department received reports that R.M. physically abused A.T.M. and neglectfully supervised all three children. Broll averred that "[t]here is an immediate danger to the physical health or safety of the children and they have been the victim of neglect due to [R.M.'s] drug use." The same day, the trial court signed an order naming the Department temporary sole managing conservator and finding, among other things, that "there is immediate danger to the physical health and safety of the children or the children have been the victims of neglect or sexual abuse or trafficking . . . ." Later, at the initial adversary hearing on April 17, 2019, Broll testified that both appellants agreed to have the Department named temporary managing conservator of the children, with appellants named possessory conservators. The trial court subsequently signed another order compelling appellants' compliance with the service plan and finding, in relevant part, that "there was a danger to the physical health or safety of the children which was caused by an act or failure to act of the person entitled to possession." The April 19, 2019 order does not explicitly state that the children were removed for abuse or neglect.

R.M. contends that Broll's testimony at the initial adversary hearing constitutes a binding Rule 11 agreement, and therefore "there was no removal of the children pursuant to [] Chapter 262 of the Texas Family Code 'for the abuse of [sic] neglect of the child.'" We disagree. There is nothing in the record indicating that R.M. agreed for the children to be removed from her care. Although Broll testified that R.M. agreed to have the Department named temporary sole managing conservator, that testimony came several weeks after the children were removed, and Broll did not say when the purported agreement was made. Instead, it is apparent that removal was ordered based principally on Broll's affidavit, which detailed several allegations of abuse and neglect by R.M. The trial court did not err in concluding that the children were removed from R.M. under Chapter 262 "for the abuse or neglect of the child[ren]" under part (O). We overrule her first issue.

By her second issue, R.M. contends she made a good faith effort to comply with the service plan and that her failure to comply was not her fault. *See id.* § 161.001(d). She points to her trial testimony that, had she complied with all of the Department's requests for drug tests, she would have lost her job. R.M. also points to her testimony that she was in the process of undergoing individual therapy; thus, "part of the service plan was still currently going on" and "termination might have been premature based upon the fact that R.M. was still receiving services."

We construe R.M.'s third issue as challenging the legal sufficiency of the evidence to support the trial court's finding that she did not prove the elements of the § 161.001(d) defense by a preponderance of the evidence. When a party attacks the legal sufficiency of the evidence supporting an adverse finding on an issue on which it bore the burden of

29

proof by a preponderance of the evidence, "the judgment must be sustained unless the record conclusively establishes all vital facts in support of the issue." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). "An issue is conclusively established when the evidence is such that there is no room for ordinary minds to differ as to the conclusion to be drawn from it." *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex. 1982).

R.M. has not conclusively established that her failure to comply with the service plan was unattributable to any fault of her own. Among other things, the service plan in this case required R.M. to refrain from engaging in any criminal activity, to submit to random drug screens, and to provide the Department "with proof of financial income to support the family." Though R.M. argues she was unable to simultaneously maintain legitimate employment while complying with the Department's drug test requests, she does not offer any similar explanation for her failure to refrain from criminal activity. Instead, she admitted that she was selling illegal drugs in October 2019, when she was arrested for possession of ecstasy, marijuana, unprescribed valium, and a drug test falsification device. There is no evidence in the record—much less conclusive evidence—that R.M.'s failure to comply with this service plan requirement was "not attributable to any fault of [R.M.]." TEX. FAM. CODE ANN. § 161.001(d). The evidence was legally sufficient to support the trial court's finding. R.M.'s second issue is overruled.[12]

## B.    Trial Court Partiality

By her third issue, R.M. argues that termination under any grounds would be

---

[12] R.M. does not challenge the trial court's finding that termination of her parental rights was in the children's best interest. See TEX. FAM. CODE ANN. § 161.001(b)(2).

improper due to the "conduct of the trial court during the termination hearing." She contends the trial court "made multiple remarks towards [her] which would lead all reasonable persons to believe that the trial court was not being impartial" and that "at times the trial court was actively advocating against [her] in a breach of the duties of the trial court."

### 1.      Challenged Conduct

R.M. points to several instances in the trial record which she claims constitute improper trial court conduct and indicate the trial court's partiality against her. Many of them involve the trial court asking its own questions of witnesses and expressing skepticism as to R.M.'s testimony.

First, when Koenig testified that she could not remember what the children's condition was at the time of removal, the trial court intervened to ask whether there were any photos in the Department's file. Koenig explained that she would need to download them with her computer, and the trial court directed the witness to do so, stating: "I think it's important for the Court to be able to see, feel, taste, touch what the children's condition was upon removal." The trial court then had the photographs printed out, admitted them as court's exhibits, and briefly questioned Koenig about them. In the photos, the children do not appear dirty, injured, malnourished, or otherwise mistreated.

Second, when R.M. testified that D.L. punched her in the nose, the trial court questioned her about why she was assaulted and whether she filed a police report. R.M. stated she did not file a police report or press charges because she "figure[d she] had a bigger fight with [the Department]." R.M. also testified that she was not sure why D.L. hit her, at which point the following colloquy occurred:

THE COURT:      What did he tell you was the reason he assaulted you? If he's beating you up and breaking your nose, he's telling you why.

THE WITNESS:    We had recently split up. I mean, I don't know. I still don't know about that.

THE COURT:      So you want me to believe that this guy broke your nose and never said anything about why he was breaking your nose?

THE WITNESS:    I don't know why it happened.

THE COURT:      That wasn't my question. My question is: You want me to believe that this guy, [D.L.], broke your nose and never once said why he was breaking your nose, why he was mad, why he was upset?

THE WITNESS:    I'm not sure.

THE COURT:      I didn't ask you that. See, you keep answering your question. My question was: Did he ever indicate—

THE WITNESS:    No, no.

THE COURT:      No to what? What question was I going to ask you?

THE WITNESS:    You were asking if he indicated on why he was doing it?

THE COURT:      Yeah.

THE WITNESS:    No.

THE COURT:      Okay. So he just hauled off for no reason at all and broke your nose?

THE WITNESS:    I mean, he was, you know, saying stuff. I was literally blocking out. I was just trying to get home.

THE COURT:      Okay. So what I need to believe as the person who makes the decisions is—

THE WITNESS:    I guess his assumptions.

THE COURT:      Let me finish. What I need to consider, since this is all you've given me, is that [D.L.] broke your nose for no reason that you know of and you had to seek doctor's treatment and was out of work for two weeks. That's

32

what you want me to believe?

Yes or no?

THE WITNESS:	I mean, I guess.

THE COURT:	No, it's not, I guess. If you want to tell me what the reason was, that's fine. If you want me—

THE WITNESS:	My only thing that I can say is, you know, his assumptions of why he thought I was on that side of town or whatever, because that's the only thing that he indicated to me.

THE COURT:	Did he think you was skipping out on him?

THE WITNESS:	We weren't together.

THE COURT:	Then he wouldn't have cared, would he?

THE WITNESS:	Obviously, he did.

THE COURT:	Okay. I am not willing to go around the mulberry bush anymore. I've got enough from what you've said.

Third, after R.M. testified that she missed some drug tests because the Department only gave her "hours" of advance notice and she could not leave her job, the following exchange occurred:

THE COURT:	What if you didn't take the drug test and you had to go to jail, could you get there in a couple of hours?

THE WITNESS:	I am not sure. I would probably lose my job.

THE COURT:	No. I am just saying if you had—if the alternative was, you don't get there in two hours, then you got to go to jail, do you think you could probably make it there in two hours?

THE WITNESS:	I think they would have to let me off.

THE COURT:	Or you would leave, right?

THE WITNESS:	Yeah.

THE COURT:	Okay. It just isn't important enough right yet.

33

THE WITNESS:     I mean, no, it's not like that. I mean, I had to have a job as one of my requirements as well.

Fourth, at the conclusion of R.M.'s testimony, the following colloquy occurred:

Q. [R.M.'s counsel]  Is there anything else that I haven't asked you at this point that you would like to tell the judge of why you want to be in their lives and what you've learned through this whole 18-month process here?

A. [R.M.]     Well, there's plenty I could say, but what I will say is, you know, I am not proud of how things led. But as far as who I am today, I am proud of that, and I don't think me or my kids deserve this at all. I think it's going to do more damage than y'all realize.

Q.     So you believe it's not in the best interest emotionally for your, seven-, eight-year-old child to be torn away from you for the next 10 years?

A.     (Shakes head side to side.)

THE COURT:     It's better they see their mama punched in the face and broken nose?

THE WITNESS:     No, I didn't stay in those—I didn't stay in that environment for a reason.

THE COURT:     Well, I am sure that's comforting to your children. What do you think they thought when they saw mommy beaten?

THE WITNESS:     I know.

THE COURT:     No, I am asking you.

THE WITNESS:     I know, traumatized. I know.

Fifth, after the attorneys completed their questioning of Hayward, the following exchange occurred:

THE COURT:     Ma'am, have you seen [R.M.'s] feet since you sat down?

THE WITNESS:     Yes, sir.

THE COURT:     Do you know that the last time we had about a six-hour

34

hearing, it went like that the whole time?

THE WITNESS: Yes, sir.

THE COURT: And it's gone the whole time.

THE WITNESS: Yes, sir.

THE COURT: Have you ever treated people for meth problems?

THE WITNESS: Yes, sir.

THE COURT: Have you ever noticed symptoms similar to that?

THE WITNESS: Yes, sir. Well, to me that may look like an anxiety response.

THE COURT: Or shaking like this (motioning)?

THE WITNESS: Typically that's present in anxiety and stressful situations as well.

THE COURT: Okay. And one of those would be if you had anxiety and you were using meth, right, in a situation such as this?

THE WITNESS: I wouldn't know in a situation such as this.

THE COURT: Okay. All right.

Sixth, upon hearing evidence about R.M.'s arrest outside a Walmart, the trial court directed the Department's counsel to produce the written police report relating to the incident. The trial court admitted the report as a court's exhibit and read it into the record. According to the report, police found R.M. asleep in a chair inside the store, arrested her for outstanding warrants, and discovered various illegal drugs in her purse. After reading the report into the record, the trial court remarked: "Okay. That's just the Court's exhibit for my attention. I believe that disputes some, if not the majority, of the testimony [R.M.] gave about the Wal-Mart incident."

Seventh, when R.M.'s counsel asked Ortiz-Washington whether R.M. has

35

completed some counseling sessions, the trial court interrupted to state: "I believe all this is in the record, is it not, [counsel]? . . . So why are we asking it again? I am curious, I mean, seriously." Counsel explained that, although R.M. testified she completed some counseling sessions, the Department did not "verify" that fact.

Finally, R.M. complains by this issue that the trial court's failure to issue findings of fact and conclusions of law prevented her from "being able to fully protect her rights" on appeal.

We observe two additional instances in the record in which the trial court engaged in arguably objectionable commentary. First, the record shows the following exchange occurred after D.L.'s counsel asked R.M. whether D.L.'s mother's residence would be "a good place" for P.F.L.:

| | |
|---|---|
| A. [R.M.] | (Moving head up and down.) |
| Q. [D.L.'s counsel] | And your answer was yes? |
| THE COURT: | Why did you pause so long? |
| | Don't be laughing. Just tell me why you paused. Just tell me why you paused. Obviously you have concerns. |
| THE WITNESS: | I don't really have no concerns, no. |
| THE COURT: | Then why did you pause for so long? |
| THE WITNESS: | I just had to think. |
| THE COURT: | You must think I am the stupidest guy in the world. |
| | Ask your next question. |

Second, after R.M. testified that she never saw D.L. use drugs, the court made the following remark:

| | |
|---|---|
| THE COURT: | . . . Are you okay? |
| THE WITNESS: | Yes, sir. |

THE COURT:        Do you know how much you're shaking your legs? Do you have any idea, seriously?

THE WITNESS:      I do.

THE COURT:        Ma'am, have you been watching?

THE BAILIFF:      I have been watching.

THE COURT:        Has she quit shaking her legs?

THE BAILIFF:      No.

THE COURT:        Just your legs are going just like this (shaking).

THE BAILIFF:      You're completely safe, okay?

THE COURT:        Okay. Continue.

Let the record reflect the legs ain't quit shaking.

## 2.    Applicable Law

All parties have a right to a fair and impartial trial before a neutral judge. *Ellason v. Ellason*, 162 S.W.3d 883, 887 (Tex. App.—Dallas 2005, no pet.); *Markowitz v. Markowitz*, 118 S.W.3d 82, 86 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *Earley v. State*, 855 S.W.2d 260, 262 (Tex. App.—Corpus Christi–Edinburg 1993, no pet.) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)); *see* U.S. CONST. art. XIV; TEX. CONST. art. 1, § 13. We presume the trial judge was neutral and detached "[i]n the absence of a clear showing to the contrary." *Earley*, 855 S.W.2d at 262.

The United States Supreme Court has held that opinions a judge forms during a trial do not establish judicial bias so as to require recusal "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* "[E]xpressions of

impatience, dissatisfaction, annoyance, and even anger" also do not, alone, show bias or partiality. *Id.* at 55–56 ("A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune."). And, a trial court has the inherent power to control the disposition of cases "with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

Texas courts have also held that "the discretion vested in the trial court over the conduct of a trial is great." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001) (per curiam) (citing *Schroeder v. Brandon*, 172 S.W.2d 488, 491 (Tex. 1943)). "A trial court has the authority to express itself in exercising this broad discretion." *Id.* Further, a trial court may properly intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time. *Id.* (citing *Hoggett v. Brown*, 971 S.W.2d 472, 495 (Tex. App.—Houston [14th Dist.] 1997, no pet.); *Great Global Assurance Co. v. Keltex Props., Inc.*, 904 S.W.2d 771, 777 (Tex. App.—Corpus Christi–Edinburg 1995, no writ)).

> Although the court should limit its participation in a trial to the exercise of supervision, a judge is not prohibited from directing appropriate comments to a witness. And provided that he maintains an impartial attitude, the judge may address questions to a witness for the purpose of clarifying any issue before the court.

*Stewart v. State*, 438 S.W.2d 560, 562 (Tex. Crim. App. 1969); *see Born v. Virginia City Dance Hall & Saloon*, 857 S.W.2d 951, 957 (Tex. App.—Houston [14th Dist.] 1993, writ denied) ("For the purpose of eliciting evidence that has not otherwise been brought out, the judge may put competent and material questions to a witness, and where anything material has been omitted, it is sometimes his duty to examine a witness."); *see also Lagrone v. State*, 209 S.W. 411, 415 (Tex. Crim. App. 1919) ("The law contemplates that

the trial judge shall maintain an attitude of impartiality throughout the trial.").

In *Trahan v. Trahan*, the Beaumont court of appeals held that the appellant's right to an impartial judge was not violated even though the trial court "asked many more questions than either of the attorneys." 732 S.W.2d 113, 114 (Tex. App.—Beaumont 1987, no writ). The court noted that the trial judge has a duty to "put[] competent and material questions to a witness in order to clarify testimony or to elicit testimony that has not otherwise been brought out," and that such practice is "especially proper" in a bench trial where the best interests of children are at issue. *Id.* at 115 ("The court should have all the facts possible in order to make an intelligent decision. If the attorneys fail to develop the facts, it is the trial judge's responsibility to the children to attempt do so himself.").

### 3. Analysis

The Department argues R.M. failed to preserve this issue for appellate review because she did not object to any of the complained-of comments at trial, nor did she complain in a motion for new trial that the judge was biased or impartial or had committed improper conduct.[13] *See* TEX. R. APP. P. 33.1(a)(1) (providing that, "[a]s a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a timely request, objection, or motion").

Though R.M. is entitled under the United States and Texas Constitutions to a fair and unbiased trial, even constitutional complaints may be waived by failure to comply with rules regarding preservation of error. *See In re C.T.*, 749 S.W.2d 214, 217 (Tex. App.—San Antonio 1988, no writ). And as the Department notes, there is no exception to

---

[13] We also observe that R.M. did not move for the trial court's recusal. *See* TEX. R. CIV. P. 18b(b)(1) ("A judge must recuse in any proceeding in which . . . the judge's impartiality might reasonably be questioned.").

preservation rules for complaints regarding how the trial court conducted the trial. *See Sklar v. Sklar*, 598 S.W.3d 810, 825 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (addressing need to preserve complaint that trial court abused its discretion by questioning witnesses and by advocating for one party); *see also T.A.W. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-20-00364-CV, 2021 WL 81866, at *9 (Tex. App.—Austin Jan. 8, 2021, pet. denied) (mem. op.).

But there is a narrow exception to error-preservation rules for certain "fundamental" errors, including "those instances in which error directly and adversely affects the interest of the public generally, as that interest is declared by the statutes or Constitution of our State." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006). As the Texas Court of Criminal Appeals has noted, when the partiality of a judge is brought into question in a jury trial, the "typical justification for requiring contemporaneous objection loses some of its potency" because an objection may well be futile and counterproductive. *Proenza v. State*, 541 S.W.3d 786, 799 (Tex. Crim. App. 2017) (finding appellant did not forfeit claim that trial court made improper comments on the weight of the evidence by failing to lodge objections at trial). In jury trials, an error regarding improper court conduct need not be preserved if "the conduct or comment cannot be rendered harmless by proper instruction." *Dow Chem. Co.*, 46 S.W.3d at 241.

In some circumstances, a complaint regarding judicial conduct during a bench trial may also be raised for the first time on appeal. For example, in *In re L.S.*, the trial court's "entire course of conduct, which constituted more than isolated remarks on the record or unfavorable rulings, revealed his deep-seated antagonism against Father that had its apparent genesis in [a] prior and separate termination proceeding regarding [two other

children], neither of which were Father's children." No. 02-17-00132-CV, 2017 WL 4172584, at *20 (Tex. App.—Fort Worth, Sept. 21, 2017, no pet.) (mem. op.).[14] The Fort Worth court of appeals held that the trial court's "conduct, as clearly shown on the face of the record, revealed a level of bias and partiality that harmed Father by depriving him of his right to a fair trial before an impartial fact-finder and constituted fundamental error" which did not need to be preserved at the bench trial. *Id.* (observing that "the trial judge's questioning of Father, including his threats to have Father prosecuted and intemperate characterizations of his testimony as 'ridiculous' and 'crap,' reveals that all impartiality had been irretrievably lost"). The court further noted that, even if an objection or motion to recuse were necessary to preserve error, "the trial judge's actions stymied Father's counsel and their ability to represent him, rendering their assistance constitutionally ineffective." *Id.* at 20 n.21.

The trial court was entitled to ask questions to clarify testimony and to elicit evidence "that has not otherwise been brought out." *See Born*, 857 S.W.2d at 957. The court's request that Koenig produce photographs of the children's residence, its request that the Department's counsel produce the police report of the Walmart incident,[15] and its questioning of Hayward regarding R.M.'s demeanor at trial fall squarely within that

---

[14] Specifically, the trial court "fast track[ed] the termination trial for no other stated reason than that he personally believed Father had not had a 'miraculous turnaround' since the prior termination proceeding." *In re L.S.*, No. 02-17-00132-CV, 2017 WL 4172584, at *20 (Tex. App.—Fort Worth Sept. 21, 2017, no pet.) (mem. op.). The judge also "essentially coerced [the Department] into seeking termination to the exclusion of reunification"; refused to continue the trial when Father's original court-appointed counsel had a scheduling conflict; insisted that "Father should have paid for his own paternity test even though indigent"; refused to "recognize Father's presumptive indigence"; erroneously refused to rule on counsel's "post-trial motion to withdraw or Father's post-trial indigence affidavit"; and delayed in "appointing appellate counsel during a critical stage of the trial." *Id.*

[15] No witness testified as to the authenticity of the police report, which was comprised entirely of hearsay. But R.M. did not object to the introduction of the police report into evidence or to the trial court's recitation of its contents into the record. *See* TEX. R. EVID. 802 ("Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay.").

category. Additionally, the court was well within its discretion to expedite the trial when it interrupted Ortiz-Washington's testimony. And, like G.B. II, R.M. does not explain how the trial court's failure to file findings of fact and conclusions of law harmed her. *See* TEX. R. APP. P. 38.1(i).

Some of the trial court's remarks, on the other hand, were clearly inappropriate, and this Court would be remiss if it did not express its dismay and disapproval thereof. For example, several questions the court asked were obviously not intended to generate useful information as to any material issue in the case. First, the court repeatedly asked R.M. if D.L. told her why he broke her nose, despite the fact that R.M. had already clearly stated he did not. The trial court would not take "no" for an answer but instead repeatedly and condescendingly asked R.M. whether she was asking him to believe her testimony. Second, when R.M. testified she believed it was in the best interest of the children for her rights not to be terminated, the trial court asked: "It's better they see their mama punched in the face and broken nose?" This was not an earnest request for clarification of testimony—rather, it was a rhetorical question calculated to embarrass and belittle the witness, and it put the trial court's incredulity of R.M. on full display. If the Department's counsel had asked these questions, the trial court would have likely sustained an objection to them on grounds that they had been asked and answered and were argumentative.

Similarly, if an attorney had reacted to a witness's answer with, "You must think I am the stupidest guy in the world," the trial court would have been well within its discretion to sustain an objection to the comment, to strike it from the record, and to reprimand the attorney for unprofessional behavior. Finally, though Hayward pointedly refused to state

42

that persistent leg-shaking is a sign of methamphetamine use, the trial court interrupted R.M.'s testimony to point out that "the legs ain't quit shaking." The evidence established that R.M. had used methamphetamine in the past, but to the extent the trial court took R.M.'s behavior at trial to indicate she was then intoxicated as a result of using methamphetamine, that was improper because there was nothing in the record to support that inference.

We recognize and appreciate the stress associated with a trial of this nature; however, a judge is duty bound to "be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity." TEX. CODE JUD. CONDUCT Canon 3(B)(4), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B. A judge "should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." *Id.* Canon 2(A). At times, the trial court in this case failed to meet this standard and did not exhibit the "attitude of impartiality" that is required of all jurists. *See Stewart*, 438 S.W.2d at 562; *Lagrone*, 209 S.W. at 415. We do not condone this behavior.

That said, the claimant bears the burden to explain how any comments made by the trial judge were incurable or would excuse the claimant's failure to preserve error. *In re Commitment of Fontenot*, 536 S.W.3d 906, 918 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing *Dow Chem. Co.*, 46 S.W.3d at 241); *In re Commitment of Stuteville*, 463 S.W.3d 543, 557 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). We conclude R.M. has failed to satisfy that burden. R.M. does not address preservation of error in her brief; in particular, she does not argue that preservation of error was unnecessary because the error was "fundamental" or under any other legal rationale. *See* TEX. R. APP. P. 38.1(i).

43

Moreover, considering the entire record, we cannot say that these instances of improper conduct reveal a "deep-seated favoritism or antagonism that would make fair judgment impossible." *See Liteky*, 510 U.S. 540 at 555. In particular, unlike in *L.S.*, the record here does not reveal that the trial court developed any antagonism or bias against R.M. based on prior proceedings in an unrelated case. *Cf. In re L.S.*, 2017 WL 4172584, at *20. Accordingly, we overrule R.M.'s third issue.

## V. MODIFICATION OF JUDGMENT

As a sub-issue to his third issue, G.B. II notes that the trial court's judgment incorrectly states that G.B. II "although duly and properly notified, did not appear and wholly made default." We modify the trial court's judgment to reflect that G.B. II appeared telephonically at the September 22, 2020 part of the trial and in person at the October 12, 2020 part, and that he was represented by counsel on both occasions. *See* TEX. R. APP. P. 43.2(b); *Int'l Bus. Machines Corp. v. Lufkin Indus., Inc.*, 564 S.W.3d 15, 38 (Tex. App.—Tyler 2017) ("This court has the power to modify the judgment of the court below to make the record speak the truth when we have the necessary information to do so."), *aff'd in part, rev'd in part on other grounds*, 573 S.W.3d 224 (Tex. 2019).

## VI. CONCLUSION

The trial court's judgment is affirmed as modified herein.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
24th day of June, 2021.